UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH DAKOTA

| | | |
|---|---|---|
| In Re: | ) | Bankr. No.09-50082 |
| | ) | Chapter 7 |
| THEODORE STEPHEN WOLK | ) | |
| dba Ted Wolk Apartments, | ) | Adv. No. 09-5010 |
| SSN/ITIN xxx-xx-3869 | ) | |
| | ) | |
| Debtor, | ) | |
| | ) | |
| JOHN S. LOVALD, TRUSTEE, | ) | |
| Plaintiff, | ) | |
| vs. | ) | DEFENDANT'S TRIAL BRIEF |
| | ) | |
| KATHRYN M. TENNYSON, | ) | |
| PENNINGTON COUNTY, | ) | |
| ABN AMRO MORTGAGE GROUP, | ) | |
| INC., | ) | |
| GREAT WESTERN BANK, | ) | |
| Defendants. | ) | |

Defendant, Kathy Tennyson, submits the following as her trial brief in this proceeding:

FACTS

Kathy Tennyson is a married woman whose husband, Ted Wolk filed this Chapter 7 Bankruptcy in the midst of their divorce proceeding. Tennyson is employed at Western Dakota Insurers at a salary of approximately $37,600.00 annually. She is 58 years of age. Tennyson resides at 219 Berry Boulevard in Rapid City, the residential real estate that is the subject of this adversary proceeding. She has resided there since the property was purchased and since her marriage to Wolk. The house was purchased for the sum of $182,000.00 and the funds used to buy it consisted of a new loan in

1

Tennyson's name only for $109,100, approximately, $28,000.00 that she received from the sale of her previous home and a $45,000.00 gift from Wolk.  At the time of purchase, May 28, 2003, a Warranty Deed prepared by the title company showed that Wolk and Tennyson were to be joint tenants with the right of survivorship.  This deed was altered to create a tenancy in common, which Wolk and Tennyson initialed but which Tennyson neither understood nor recognized as creating an interest in the real estate for Wolk.  Tennyson understood that she would be the sole owner, as the Purchase Agreement indicated she was the sole purchaser and she is the only obligor on the Purchase Money Note and mortgage.

Wolk sued Tennyson for divorce on March 6, 2008.  In addition to the residence at 219 Berry Blvd., where Tennyson resides, the marital estate consisted of several other parcels of residential and commercial real estate titled to Wolk, which properties are set forth in Wolk's bankruptcy schedules.  Wolk valued the 219 Berry Blvd. home at $219,000.00 in his Schedules, subject to a first mortgage lien of $99,700 and a second lien in the amount of $22,087, suggesting an equity of over $97,000.00.

The Trustee conducted no independent appraisals on the real estate until June 7, 2010, when Countryside Appraisal Services issued it's opinion that the property was worth $191,000.00, or $28,000.00 less than asserted by Wolk in his Schedules. Tennyson received a home inspection on the property on June 3, 2010, indicating several deficiencies that would reduce the market value further.  Tennyson believes her residence is worth no more than $170,000.00 to $180,000.00 in the current market.

The present mortgage balances on the property are, approximately, $122,200.00.

Since the beginning of the Wolk vs. Tennyson divorce and throughout this proceeding, Tennyson has been regularly treated and medicated for depression related symptoms. Tennyson has been reprimanded at her place of employment and has, generally, not handled well the slow unraveling of her marriage and financial well being. While Tennyson and Wolk appeared to have a financially secure future at the time of their marriage, with Wolk's net worth reported by him as high as $399,174.00 as of 2-23-2008, Wolk's gambling and dissipation of assets has resulted in Tennyson being able to count on only her income and her home equity as she approaches retirement age. Since the bankruptcy filing, Tennyson has paid the mortgage payments and real estate taxes, generating additional equity.

Tennyson is not credit worthy for a new home loan and has received a denial for a recent application in the amount of $125,000.00. She has no savings or retirement account. She is not financially or physically able to move from her residence due to the estimated expenses for moving and storage. She is emotionally and mentally incapable of tolerating the trauma of displacement and loss of equity. She receives a deduction on her annual income tax return for payment of real estate taxes and mortgage interest.

Tennyson believes the evidence in this proceeding will further show the following:

| | | |
|---|---|---|
| | $176,000.00 | Maximum estimated sale price after a 6 - 12 months listing |
| Less | $ 11,194.00 | Realtor's fees at 6% plus tax |
| | $ 500.00 | Title insurance |
| | $ 250.00 | Closing costs and transfer fees |
| | $ 3,016.00 | Real estate taxes, last half of 2009, first half of 2010 |
| | $ 97,000.00 | First mortgage pay-off |
| | $ 25,200.00 | Second mortgage pay-off |
| | $ 38,840.00 | Net |

Estate share    $19,420.00

Less

　　Trustee's commission

　　11 USC § 326(est)    $11,010.00

　　Trustee attorney,

　　no less than    $ 8,410.00

　　$ available to pay
　　general unsecured claims    0.00

Against this non-benefit to the estate, Tennyson experiences the following detriments:

a)　Psychological and emotional injury from displacement, possible loss of income and employment;

b)　Moving and storage expenses, $3,500.00 for moving, up to $600.00 per month for storage;

4

c)  Loss of tax deduction for interest and real estate taxes, resulting in loss of, approximately, $2,000.00 per year in additional income tax;

d)  Loss of equity in home, including her initial contribution at the time of purchase of $28,000.00, plus the $45,000.00 gift she received from Wolk;

e)  Legal expenses of, approximately, $10,000.00;

f)  Inability to purchase another residence due to age, income and credit damage.

## ARGUMENT

### 11 USC § 363(h).

Trustee Lovald is seeking to compel the sale of Tennyson's residence to realize funds for the bankruptcy estate out of Wolk's interest as a co-owner. The parties do not believe the elements of § 363(h) at subparagraphs (1), (2) and (4) are at issue before the Court, only the benefit, detriment test found in subparagraph (3) This subsection allows for a sale only if:

(3)  The benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners.

The Trustee's burden is to show that the benefit to the estate of a sale of 219 Berry Blvd., free and clear of interests of co-owners outweighs any detriment to the co-owner. This is an expansive inquiry. Detriment to the co-owner spouse can include

5

economic as well as non-economic factors.  In Re Persky, 893 F 2d.15, 20-21 (2nd Cir. 1989).  This inquiry is fact intensive and must be determined on a case by case basis.  Possible "detriment" to the non-debtor, co-owner includes emotional and psychological harm as well as "any loss, harm, injury or prejudice resulting from involuntary displacement."  In Re Trout, 146 B.R.823, 829 (Bankr. N.D. 1992).

In determining the benefit to the estate, the Court must consider a potential distribution to unsecured creditors.  Payment of a significant dividend is a substantial benefit to the estate.  In Re Gauthreaux, 206 B.R. 502 (Bankr. N.D. Ill 1997). If there is no probability of a significant benefit, the Trustee does not meet his burden. See, In Re McCoy, 92 B.R. 750 (Bankr. N.D. Ohio, 1988) (where the Court found that the administrative costs of a sale would far exceed any equity available to creditors and render a return to creditors of zero).  Some courts have determined that a benefit to the estate is recognized even when unsecured creditors get nothing because the estate "benefits" when the secured creditors get paid. In Re Bell, 80 B.R. 104, 106 (Bankr. N.D. Tenn. 1987). Other courts hold that a sale that results in no significant payment to general unsecured creditors will not meet the test. Matter of Ray, 73 B.R. 544, 549 (Bankr. M.D. Ga. 1987).

Because Wolk is not liable on the first mortgage note,  In Re Bell does not help the Trustee and payment of secured claims does not benefit the estate.  Wolk is liable on the second lien, a home equity line of credit, but so is Tennyson and there is no particular benefit to the estate for that lien to be paid if it is as likely to be paid by the

non-debtor. In In Re McCoy, 92 B.R. 750, the non-availability of funds for payment to unsecured creditors in a proposed § 363(h) sale compelled the court to deny a sale because of the overriding detriment to the displaced co-owner.  While it is not clear from that case what value the property had, the Court was able to conclude that "no possible dividend or return to creditors could be had because the cost of selling the property would wipe out creditor interest. This court is not interested in selling property just to pay the trustee or his attorneys a fee, or a commission to a real estate agent." In Re McCoy , supra at 752, quoting, Matter of Spain, 85 B. R. 874, 878 (BAnkr. N.D. Ala. 1988).  Because administrative expenses would wipe out funds available to pay creditors the sale was denied.

    In this case the Trustee has chosen to rely on a fair market value appraisal to establish his right to sell over the opposition of Tennyson.  Fair market value is that price that a willing purchaser would pay to a willing buyer with neither being under any compulsion. Such a valuation is not a fair barometer on which to rely for the sale and dispossession of a co-owner.  While such a valuation might be adequately credible for unoccupied, commercial or agricultural land it misses the mark here.  While the Trustee's appraiser may opine that $191,000.00 is fair market value, the likelihood of a sale at that price is dismal.  This is an occupied home with an unwilling seller.  Potential buyers or bidders would know that they are effectively participating in an eviction.  There is no other way to view the matter. That is a fact. Under South Dakota law Sellers must provide a Property Disclosure Statement, which may reveal defects or

issues that affect sale price. The Trustee has this responsibility.  It has not been prepared and no Appraiser has considered the possible contents of such Disclosure. No potential buyer has been approached. No offers are on the table.  Tennyson has obtained a property inspection report showing cosmetic and structural concerns that a potential buyer would want to know and that typically would result in significant negotiations regarding closing costs or purchase price. Any suggestion that a fair market appraisal is sufficient to satisfy the Trustee's burden as to the eventual benefit to the estate under circumstances such as these is problematic at best.

It is Tennyson's position that market conditions and non-market factors will combine to significantly reduce the potential of any payment to Wolk's creditors.  A property inspection conducted by Hayman and Associates on June 3, 2010 specifically identified several concerns requiring both minor and significant remedial repair. Major concerns were an improperly installed deck roof that could cost up to $3,500.00 to repair and an almost certain and immediate need for a new sewer line at a cost of $8,000.00 plus, depending on materials.  In Tennyson's factual summary above she estimated a possible return based on a sale price of $180,000.00.  This is a best case scenario. Worst case scenario is an auction that may result in a further sale price reduction by 20% to 30%.  Where the selling price for a home is speculative at best, the Trustee has not met his burden. In Re Gauthreaux, 206 B.R. at 506. Tennyson has commissioned a market analysis from a real estate broker which indicates a potential sale value of less than $180,000.00

Tennyson will experience significant detriments should the Trustee sell her home. She does not have the credit to exercise her right of first refusal. She cannot get a loan. If she loses her home she will need assistance in moving and storage at a significant cost. She will not be able to obtain a new loan to buy another house. She will lose the ability to deduct mortgage interest and real estate taxes, increasing her federal tax liability in ensuing years. She has and will incur significant legal fees in exercising her due process rights herein. Her original equity contribution will be significantly diminished from her original down payment of her homestead funds of $28,000.00 and the gift of $45,000.00 she received at the time of her marriage and purchase of this home. See, In Re Gauthreaux, supra, (where court found it significant that the non-debtor spouse was the sole contributor to the purchase of the home). She has paid the real estate taxes and mortgage payments on this home since the bankruptcy case was filed and before. Should she be entitled to an administrative claim for some of this property preservation expense, unsecured creditors will be further pushed down the line.

Emotional and psychological costs of forcing the sale and eviction of a non-debtor spouse are always factors that the court must consider. Difficult as they may be to assess, such factors have been recognized to have considerable weight and dispositive effect. See, In Re Harlin, 325 B.R. 184, 191 (Bankr. E.D. Mich. 2005) ("The detriment imposed on Mrs. Harlin by forcing her out of her home to pay her husband's business debts far outweighs any benefit to the estate"); Matter of Spain, 85 B.R. at

9

878 (Court recognizes that psychological and emotional damage to household members is ipso facto present).  Tennyson is and has been under the care of a physician and therapist for depression and takes medication for the same. She is likely to suffer major trauma as a result of this proceeding, most especially if she is dispossessed.

**Constructive trust.**

When 219 Berry Boulevard was purchased, the funds used to pay the purchase price included approximately $28,000.00 from Tennyson, which she received from the sale of her previous home, and a gift to her of $45,000.00 from Wolk. This was done in order to reduce the amount of money Tennyson needed to borrow as only her credit was considered by the lender.  The loan was put in her name. Wolk signed an addendum to the purchase agreement on the house indicating Tennyson would be the sole buyer.  Wolk signed a gift letter provided by the mortgage lender indicating he was giving $45,000.00 to Tennyson as his "fiancé."  This gift letter contained representations that the gift was to be applied to the purchase of 219 Berry Boulevard, that no repayment was expected or implied, and that it was understood that such representations were, if false, subject to Federal Criminal prosecution under 18 U.S.C. Section 1012 and 1014. These code sections criminalize false statements made in furtherance of lending processes with federal depository institutions.

At the time of closing Wolk and Tennyson signed separately at the title company.  Tennyson was able to take only minutes off from work to run to the title company and sign what they put in front of her.  One such document was the deed to

the property which had been altered from joint tenancy to tenancy in common. She initialed where she was asked to but did not know or inquire what for.  She understood that the house would be put in her name only. The deed was prepared by a third party, not by Tennyson or Wolk or anyone under their direction. The alteration to tenancy in common was done under the direction of Wolk, directly contrary to the loan application process and addendum to the purchase agreement. Tennyson was an unknowing participant in the change and Wolk acted in direct contradiction to the Gift letter. This court has held that individuals are bound by prior admissions and statements to government agencies and Wolk should be held to his original statement under federal law that he was gifting $45,000.00 to Tennyson and therefor awarding her the entire equity in the home.  See, In Re Ceferino Lipata Datoon, Jr., Case No. 09-04018, United States Bankruptcy Court, District of South Dakota, Decision Re: Defendant's Motion for Summary Judgment (doc. 16).

A constructive trust pursuant to SDCL 55-1-8, et seq may be imposed under such circumstances to prevent unjust enrichment and redress fraud.  McFarland v. McFarland, 470 N.W.2d 849,851(S.D. 1990); Rosebud Sioux Tribe v. Strain, 432 N.W.2d 259, 263 (S.D. 1988).  It has been held in McFarland v. McFarland, supra, that "there must exist a confidential relationship and undue influence by virtue of which a person had obtained legal title to property which he ought not in equity and good conscience hold and enjoy."  Supra.  SDCL 55-1-8 and 55-1-9 permit the imposition of an implied or constructive trust under these circumstances where Wolk made a

representation under of a gift of $45,000.00 to his fiancé Tennyson, which representation was made to permit her to purchase and own the 219 Berry Boulevard property in her name.  The deed was subsequently incorrectly prepared for whatever reason.  In this case the entire equity in the 219 Berry Boulevard home should be reserved for the benefit of the original giftee, Tennyson.

Tennyson's divorce began on March 6, 2008, less than 6 years from the date the deed was prepared and filed. That divorce proceeding freezes and preserves all issues relating to the division of property between spouses and tolls the running of any limitation period in which Tennyson must bring her action or assert her position.   In addition, Tennyson was unaware of the state of the title to the home throughout her marriage. There  exists a confidential relationship between spouses.  When there is a duty to disclose, silence by one party constitutes fraudulent concealment and tolls the statute of limitations. Rosebud Sioux Tribe v. Strain, supra, at 264.  Even though Tennyson initialed a change to the deed she was unaware of it's meaning or import. She signed what was put in front of her over a 30 minute lunch break from work and had no time to do anything except rely on the representations of Wolk that the property would be held in her name and that the gift of $45,000.00 was actual and not revocable. They married immediately thereafter.  An implied or constructive trust in real estate does not become recognizable under equity until there is actually a repudiation of that trust and the trustee's possession of the real estate becomes hostile and adverse. Schwartzle v. Dale, 74 S.D. 467, 54 N.W.2d. 361, 365 (S.D. 1952).  The Wolk

divorce, bankruptcy and this adversary proceeding were the first hostile acts against Tennyson's quest to retain her home as her sole property and thus the limitation period did not begin until those latter events.

## CONCLUSION

The court should deny the sale of the Tennyson property because there is virtually no probability that the property will bring in funds to the estate to benefit any unsecured creditors. The condition of the home, the fact that it is essentially a forced sale and current market conditions indicate that the Trustee will be unable to sell it except at a significant discount from what normally could be considered market value. The detriment to Tennyson, the economic costs, not limited to the loss of her original equity, as outlined above, and the emotional, psychological costs far outweigh any conceivable benefit to the estate. There will be no benefit to general unsecured creditors.

Sufficient evidence exists to award the equity in the Berry Boulevard residence to Tennyson under the theory of implied or constructive trust.

Respectfully submitted this 17th day of June, 2010.

                         /s/ John H. Mairose
                         John H. Mairose
                         Attorney for Defendant
                         2640 Jackson Blvd., Ste. 3
                         Rapid City SD 57702
                         605/348-7836
                         605/348-9802 - Fax